# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARQUISE FOSTER,** | § | Civil Action No. 3:19-cv-148 |
| **Individually and on behalf** | § | |
| **of all others similarly situated** | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Plaintiff,* | § | Judge Eli J. Richardson |
| | § | |
| v. | § | Magistrate Judge Jeffrey Frensley |
| | § | |
| **SITEL OPERATING CORPORATION,** | § | |
| | § | **COLLECTIVE ACTION** |
| *Defendant.* | § | **PURSUANT TO 29 U.S.C. § 216(b)** |
| | § | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSED MOTION FOR CONDITIONAL CERTIFICATION AND NOTICE TO PUTATIVE CLASS MEMBERS

**TO THE HONORABLE ELI J. RICHARDSON:**

Pursuant to Local Rule 7.01(a)(2), Plaintiff, individually and on behalf of all opt-in plaintiffs and all others similarly situated ("Plaintiffs" or "Plaintiffs and the Putative Class Members"), hereby files this Memorandum of Law in Support of Plaintiff's Opposed Motion for Conditional Certification and Notice to Putative Class Members and respectfully states as follows:

### I.
### PROCEDURAL SUMMARY

Plaintiffs and the Putative Class Members are current and former hourly call-center employees who have been employed by Sitel Operating Corporation ("Sitel") throughout the United States, at any time in the last three years through the final disposition of this matter. Plaintiffs contend that Sitel failed to pay them the correct amount of overtime compensation at the required rate of one and one-half times their regular rate of pay for all hours worked and that this failure took place due to Sitel's widespread corporate policy to force Plaintiffs to work off-the-clock and without

compensation. On December 4, 2018, Plaintiff Foster filed an Original Collective Action Complaint pursuant to 29 U.S.C. § 216(b). During the three months since this lawsuit has been on file, an additional 294 current and former Sitel employees from (16) sixteen states have filed written consents to join this lawsuit.

## II.
## ISSUE PRESENTED

The issue herein is whether the Putative Class Members should be notified about the existence of this action so that they can make an informed decision about whether to join this suit and stop the statute of limitations from running on their claims for unpaid overtime compensation. The merits of Plaintiffs' claims or Sitel's common defenses are not before the Court, nor are they an appropriate inquiry for purposes of conditional certification. *See Bradford v. Logan's Roadhouse, Inc.*, 137 F. Supp. 3d 1064, 1072 (M.D. Tenn. 2015) (courts do "not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations" at the first stage of conditional certification); *see also Roberts v. Corrections Corp. of Am.*, No. 3:14-cv-2009, 2015 WL 3905088, at *10 ( M.D. Tenn. June 25, 2015). In fact, courts should use "a fairly lenient standard that typically results in certification" when deciding whether to issue notice to putative class members. *See Bradford*, 137 F. Supp. 3d at 1071 (quoting *Comer v. Wal-Mart Stores, Inc.*, 454 F. S3d 544, 546 (6th Cir. 2006)).

## III.
## SUMMARY OF THE ARGUMENT

Plaintiffs seek conditional certification of a class defined as "all current and former hourly call-center employees who worked for Sitel Operating Corporation at any time within the past three years through the final disposition of this matter." In support of this Motion, Plaintiffs have presented substantial evidence that Plaintiffs and the Putative Class Members are similarly situated in the form of declaration testimony, job postings, and other similar lawsuits against Sitel. The

consistent testimony shows that Plaintiffs and the Putative Class Members were trained, and continually counseled, by Sitel to arrive early to log-in to their computers and bring all of their necessary computer programs up before their scheduled shift start time. Even Sitel's CSRs who worked from home ("at-home call-center employees") were not paid for their time logging in to their computers and opening the programs necessary to become "call ready" and go on-the-clock. These requirements applied (and continue to apply) to all Sitel call-center employees nationwide. This evidence surpasses Plaintiffs' lenient burden at this conditional certification stage and establishes that Sitel's company-wide policies force Plaintiffs and Putative Class Members to perform work off-the-clock for which they are not paid in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19.

# IV.
# ARGUMENT & AUTHORITIES

## A.    LEGAL STANDARD FOR CONDITIONAL CERTIFICATION

The FLSA's "collective action" provision allows one or more employees to bring an action for overtime compensation on "behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). District courts have broad discretion to allow a party asserting FLSA claims on behalf of others to notify putative class members that they may choose to "opt-in" to the suit. *See Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989). Court-authorized notice protects against "misleading communications" by the parties, resolves the parties' disputes regarding the content of any notice, prevents the proliferation of multiple individual lawsuits, assures joinder of additional parties is accomplished properly and efficiently, and expedites resolution of the dispute. *Id.* at 170–72.

Under Section 216(b), an employee need only show that he is suing his employer for himself and on behalf of other employees "similarly situated." *See White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877–78 (6th Cir. 2012); *see also Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–16 (5th Cir.

1995); *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996), *cert. denied*, 117 S. Ct. 435 (1996). Indeed, plaintiffs' claims need not be identical to the potential opt-ins, <u>they need only be similar</u>. *Comer*, 454 F.3d at 546–47 ("The plaintiff must show only that his position is similar, not identical, to the positions held by the putative class members.") (internal quotations omitted).

Courts throughout the Sixth Circuit uniformly apply a two-step approach to determine whether plaintiffs are "similarly situated" to the potential plaintiffs. *See White*, 699 F.3d at 877–78; *Bradford*, 137 F. Supp. 3d at 1071. At the notice stage the court makes a decision, usually based solely on the pleadings and any declarations that have been submitted, whether to certify the class conditionally and give notice to potential class members. *Bradford*, 137 F. Supp. 3d at 1072 (citing *White v. MPW Indus. Servcs., Inc.*, 236 F.R.D. 363, 373 (E.D. Tenn. 2006) (to meet plaintiff's lenient burden at the notice stage, substantial allegations supported by declarations are "all that is required")).

The *Lusardi* approach proceeds in two stages—the "notice" stage and the "decertification" stage. *Comer*, 454 F.3d at 546. The first stage requires a plaintiff to show that the putative class members' claims are sufficiently similar to merit sending notice of the action to possible members of the class. *See Bradford*, 137 F. Supp. 3d at 1072. "[C]onditional certification need only be based on a modest factual showing and . . . the court should use a fairly lenient standard that typically results in certification." *Comer*, 454 F.3d at 546 (internal citations and quotations omitted). If the named plaintiff shows that the employees in the proposed class are similarly situated, the court may use its discretion to authorize notification of similarly situated employees to allow them to opt into the lawsuit. *See id.*

After discovery and at the second, or decertification, stage, the court employs a "stricter standard" in determining whether class members are similarly situated because the court (and the parties) have access to more information. *See id.*; *see also O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d

567, 583 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co v. Gomez*, 136 S.Ct. 663, 669 (2016). At the decertification stage, Plaintiffs must show that they are similarly situated such that proceeding on a representative basis furthers the collective consideration of common questions of fact and law. *See O'Brien*, 575 F.3d at 583–84 (recognizing that "district courts have based their final-certification decisions on a variety of factors, including the 'factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action'").

## B.    DETERMINING CONDITIONAL CERTIFICATION AT THE "NOTICE" OR "FIRST" STAGE

At the first stage of the *Lusardi* approach, an employee need only show that he is suing his employer for himself and on behalf of other employees "similarly situated." *See* 29 U.S.C. § 216(b); *White*, 699 F.3d at 877–78; *Mooney*, 54 F.3d at 1213–14; *Grayson*, 79 F.3d at 1096. In other words, at the conditional certification stage, the plaintiff "must simply submit evidence establishing at least a colorable basis for their claim that a class of similarly situated plaintiffs exist." *Bradford*, 137 F. Supp. 3d at 1071 (citing *Shabazz v. Asurion Ins. Service*, No. 3:07-0653, 2008 WL 1730318, at *3 (M.D. Tenn. Apr. 10, 2018)). If the court conditionally certifies the class and issues notice, the case proceeds as a collective action during the discovery period. *See id.* at 1072.

The relevant inquiry is whether the plaintiffs have sufficiently shown that other current and former employees were together the victims of a single decision, policy or plan. *See O'Brien*, 575 F.3d at 584–85. "But employees may also be similarly situated if their claims are merely 'unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct.'" *Bradford*, 137 F. Supp. 3d at 1071 (citing *O'Brien*, 575 F.3d at 585 (recognizing that even a requirement that employees' "causes of action under the FLSA accrued at about the time and place in the approximate manner of the named plaintiff" would be "more

demanding than what the FLSA requires")). Additionally, if there is a reason to conclude that the same policy applies to multiple locations of a single company, company-wide certification is appropriate. *See Crosby v. Stage Stores, Inc.*, 348 F. Supp. 3d 742, 748 (M.D. Tenn. 2018); *Stewart v. CUS Nashville, LLC*, No. 3:11-cv-0342, 2012 WL 4049968, at *4 (M.D. Tenn. Sept. 13, 2012).

1.      **Plaintiffs and the Putative Class Members are "Similarly Situated"**

Plaintiffs and the Putative Class Members are similarly situated and this Court should order nationwide notice based on the "substantial allegations" contained in the form of declaration testimony, job postings and other lawsuits with the same or similar allegations, and the pleadings on file. Plaintiffs and the Putative Class Members have alleged that Sitel miscalculated their regular rate of pay by failing to include time spent working off-the-clock. To comply with Sitel's company-wide policy, Plaintiffs and the Putative Class Members had to perform work off-the-clock by preparing their computer and software for taking their first call as soon as their shift started—all while unpaid. Indeed, Plaintiff Foster has made a strong factual showing that she, the Opt-in Plaintiffs, and the Putative Class Members are similarly situated. The evidence proves that Plaintiffs and the Putative Class Member all performed the same type of work, were paid an hourly rate, were subject to the same uniform Sitel pay policy, followed the same log-in procedure, and were required by Sitel—as a result of its company policies—to begin sufficiently in advance of their clock-in time so that they could be "call ready" at the time their scheduled shift started. *See Crosby v. Stage Stores, Inc.*, 348 F. Supp. 3d 742, 748 (M.D. Tenn. 2018) (certifying a nationwide class because the declarations uniformly showed (1) employment with the same defendant; (2) the job title(s) for which certification is sought; (3) performance of similar job duties; (4) payment of wages; (5) work performed for no wage and/or in excess of forty hours per week without overtime compensation; and (6) the inapplicability of exemptions). Plaintiffs will address these facts in greater detail below.

### a. Overview of Sitel's Operational Structure & Corporate Policies

Founded in 1985, Sitel maintains a global presence in twenty-seven (27) countries and employs over 75,000 associations over more than 150 offices.[1] Sitel claims to be a leading global services firm with a revenue of 1.7 billion dollars.[2] As an integral component of its service-driven public offerings, Sitel employs numerous customer service or call-center employees across the nation who are responsible for speaking with and assisting Sitel's customers. Sitel maintains multiple call centers in the United States and further employs thousands of at-home CSRs who work for Sitel remotely.[3] Sitel operates (or has operated) call-center facilities in the United States in, at least, the following states: Alabama; Florida; Georgia; Kentucky; Maine; Mississippi; Nevada; New Mexico; New York; Oklahoma; South Carolina; Tennessee; and Texas.

To date, Plaintiff and the *296* Opt-in Plaintiffs have worked for Sitel at each call center (including call centers no longer in operation) where Sitel operates in the United States, and Plaintiffs have provided declaration testimony detailing the job requirements and setting forth the allegations made the basis of this lawsuit for nine of Sitel's call-center facilities, as well as declarations for at-home CSRs. *See* Decl. of Melissa Cannon, Ex. 3; Decl. of Alexis Dean, Ex. 4; Decl. of Chiwanda McLamb, Ex. 5; Decl. of Dishanna Garmon, Exhibit 6; Decl. of Krista Dortch, Ex. 7; Decl. Wendy Toth, Ex. 8; Decl. Keisha Buck, Ex. 9; Decl. Kendra Sturtevant, Ex. 10; Decl. Heather Wilson, Ex. 11; Decl. Marquise Foster, Ex. 12; Decl. Brittany Akers, Ex. 13; Decl. Heather Ripley, Ex. 14; Decl. Matthew Eldridge, Ex. 15; Decl. Jama Riley, Ex. 16; Decl. Shannon Ross, Ex. 17; Decl. Toyin Saheed, Ex. 18; Decl. Shandra Copeland, Ex. 19; Decl. Arthur Wilson, Ex. 20; Decl. Anastasia Wallace, Ex. 21; Decl. Mikayla Bridges, Ex. 22; Decl. Travis Grayson, Ex. 23; Decl.

---

[1] https://www.sitel.com/customer-experience-service.

[2] *Id.*

[3] https://jobs.sitel.com/content/North-America/?locale=en_US.

Samone Twitty, Ex. 24; Decl. Justine Luna, Ex. 25. Additionally, Plaintiff Foster has submitted the declarations of two supervisors corroborating Plaintiffs' allegations that they are required by Sitel, as per its company-wide policy, to perform work off-the-clock. *See* Decl. Rodney Jackson, Ex. 26; Decl. Regenia Blackwell-Blackmon, Ex. 27.

Plaintiffs have also provided consistent testimony that they were required by Sitel to arrive early so that they could be "call ready" by the time their shift began and further explained that this requirement was a result of Sitel's corporate policy. *See* Ex. 3, at ¶ 7; Ex. 9, at ¶ 7; Ex. 10, at ¶ 7; Ex. 11, at ¶ 7; Ex. 12, at ¶ 12; Ex. 13, at ¶ 7; Ex. 14, at ¶ 7; Ex. 15, at ¶ 7; Ex. 16, at ¶ 7; Ex. 17, at ¶ 7; Ex. 18, at ¶ 9; Ex. 19, at ¶ 7; Ex. 20, at ¶ 8; Ex. 21, at ¶ 7; Ex. 22, at ¶ 7; Ex. 23, at ¶ 7; Ex. 24, at ¶ 7; Ex. 25, ¶ 9. Although Plaintiffs and the Putative Class Members originally clocked-in through the Kronos App on their computers, Sitel changed its clock-in procedures and began requiring its employees to clock in at a central terminal. *See* Ex. 3, at ¶ 7 Ex. 11, at ¶¶ 7–8; Ex. 12, at ¶¶ 12–13; Ex. 14, at ¶¶ 7–8; Ex. 18, at ¶¶ 9–10; Ex. 23, at ¶¶ 7–8; Ex. 24, at ¶¶ 7–8; *see also* Ex. 9, at ¶ 7; Ex. 10, at ¶ 7; Ex. 13, at ¶ 7 (noting that although the procedure called for them to clock in at the central terminals, chronic technical issues required plaintiffs to continue using the Kronos App on their computers). However, at all times—and regardless of the clock-in procedure—Plaintiffs and the Putative Class Members were strictly instructed to be "call ready" before their shift started, and before they were permitted to clock in. *See* Ex. 3, at ¶ 7; Ex. 9, at ¶ 7; Ex. 10, at ¶ 7; Ex. 11, at ¶¶ 7–8; Ex. 12, at ¶¶ 12–13; Ex. 13, at ¶ 7; Ex. 14, at ¶¶ 7–8; Ex. 15, at ¶ 7; Ex. 16, at ¶ 7; Ex. 17, at ¶ 7; Ex. 18, at ¶¶ 9–10; Ex. 19, at ¶ 7; Ex. 20, at ¶ 8; Ex. 21, at ¶ 7; Ex. 22, at ¶ 7; Ex. 23, at ¶¶ 7–8; Ex. 24, at ¶¶ 7–8; Ex. 25, at ¶¶ 9–10. While the at-home call-center employees did not have to "arrive" early, they were equally required to begin the computer start-up and log-in procedures before clocking in. *See* Ex. 4, at ¶ 7; Ex. 5, at ¶ 7; Ex. 6, at ¶ 7; Ex. 7, at ¶ 7; Ex. 8, at ¶ 7.

Plaintiffs' testimony is also consistent with the testimony of two Sitel Supervisors. *See generally* Exs. 26 and 27. Rodney Jackson and Regenia Blackwell-Blackmon testified that as Sitel Supervisors, they lead teams of approximately fourteen (14) of call-center employees. *See* Exs. 25–26, at ¶ 4. As Supervisors, Mr. Jackson and Ms. Blackwell-Blackmon reported directly to the Operations Manager and had regular meetings with the Deputy Site Manager for the facility and the other supervisors. *See id.* at ¶ 5. During these meetings, and on an almost daily basis, the senior management for Sitel—the Deputy Site Manager—reiterated Sitel's company policy that it's call-center employees must arrive early to be "call ready" by their shift start time. *See id.* Mr. Jackson and Ms. Blackwell-Blackmon accordingly relayed and enforced Sitel's policy to their teams and told them that they needed to arrive at least fifteen minutes early to ensure that they were "call ready" when their official shift started. *See id.*

Importantly, as Supervisors Mr. Jackson and Ms. Blackwell-Blackmon were responsible for monitoring their teams' time and would review daily and weekly time reports. *See id.*, at ¶ 6. One of the key components they looked for in these reports was a performance indicator known as "variance time." *See id.* Variance time was a measure of the time between when a call-center employee clocked into the time keeping system and the time they actually became "call ready" or started accepting calls on behalf of Sitel's clients' customers. *See id.* According to Sitel's company-wide policy, call-center employees were not permitted to have a variance time over five minutes. *See id.* If a call-center employee took longer than five minutes to go "call ready" after clocking-in, they could be written up or even fired. *See id.* The Operations Managers were particularly cognizant of the call-center employees' variance time, and constantly reminded Supervisors to minimize variance time to ensure it remained below the 5-minute mark. *See id.* at ¶ 7. These policies were implemented at the corporate level and applied equally to all of Sitel's call-centers across the country. *See id.* at ¶ 8.

As a result, Sitel Managers (at all levels) stressed schedule adherence so strongly that Sitel's call center employees—Plaintiffs and the Putative Class Members—were uniformly encouraged, if not outright required, to arrive early so that they could be ready to take their first call as soon as their shift started, thereby maintaining the highest levels of productivity. *See id.* at ¶¶ 6–8; *see also Bishop v. AT&T Corp.*, 256 F.R.D. 503, 508 (W.D. Pa. 2009) (recognizing that the plaintiffs' uniform attempts to meet the defendant's "performance expectations" was sufficient to support a similarly situated finding).

### b.    Plaintiffs and the Putative Class Members Performed Similar Job Duties

In addition to working under the same overarching corporate policies, Sitel's call-center employees, such as Plaintiffs and the Putative Class Members, all performed the same or similar job duties—that is, they were all required to follow the same log-in procedures and interact with Sitel's customers over the phone. These basic facts hold true for all of Sitel's call-center locations, campaigns, and call center positions, nationwide. *See also* Sitel Job Postings Ex. 29 (identifying open positions across the nation and providing job requirements). To date, the 296 opt-in Plaintiffs have worked for Sitel in sixteen states, and at multiple call-center facilities. The table below summarizes those Plaintiffs who have provided their statements under oath by location worked, department, and job title:

| Name | City/State | Campaign(s) | Job Title(s) | Ex. |
|---|---|---|---|---|
| **Melissa Cannon** | Amarillo, Texas | USAA | Customer Service Representative | 3 |
| **Alexis Dean** | Albuquerque, New Mexico | Choice Hotels, Alight | At-Home Customer Service Representative | 4 |
| **Chiwanda McLamb** | Goldsboro, North Carolina | Equifax, Toys-R-Us, Turbo-Tax | At-Home Customer Service Representative | 5 |
| **Dishanna Garmon** | Miami, Florida | Toys-R-Us, Alight | At-Home Customer Service Representative | 6 |

| | | | | |
|---|---|---|---|---|
| **Krista Dortch** | Clarksville, Tennessee | Aon, Frontier, DirectTV | At-Home Customer Service Representative | 7 |
| **Wendy Toth** | Johnson City, Tennessee | DirectTV, Toys-R-Us, Choice Hotels | At-Home Customer Service Representative | 8 |
| **Keisha Buck** | Corning, New York | DirectTV | Customer Service Representative | 9 |
| **Kendra Sturtevant** | Corning, New York and Ocala, Florida | DirectTV, PSCU | Customer Service Representative | 10 |
| **Heather Wilson** | Lake City, Florida | DirectTV, AT&T | Customer Service Representative | 11 |
| **Marquise Foster** | Las Cruces, New Mexico | Direct TV | Technical Support Representative, Case Manager, New Customer Queue Specialist, Resolution Team Member, Retention Specialist, Protection Plan Specialist | 12 |
| **Brittany Akers** | Ocala, Florida | PSCU, Best Buy Geek Squad | Customer Service Representative | 13 |
| **Heather Ripley** | Painted Post, New York | DOW Jones, Toys-R-Us, DirectTV | Customer Service Representative | 14 |
| **Matthew Eldridge** | Painted Post, New York | DirectTV | Customer Service Representative | 15 |
| **Jama Riley** | Ocala, Florida | PSCU | Customer Service Representative | 16 |
| **Shannon Ross** | Pompano Beach, Florida | Capital One | Customer Service Representative, Fraud Account Supervisor | 17 |
| **Toyin Saheed** | Pompano Beach, Florida | Capital One | Fraud Account Supervisor, Mentor, L2 Agent | 18 |
| **Shandra Copeland** | Pompano Beach, Florida | Capital One | Customer Service Representative | 19 |
| **Arthur Wilson** | San Angelo, Texas | DirectTV, PSCU | Customer Service Representative, Coach | 20 |
| **Anastasia Wallace** | Spartanburg, South Carolina | DirectTV | Customer Service Representative | 21 |
| **Mikayla Bridges** | Spartanburg, South Carolina | USAA | Customer Service Representative | 22 |

| | | | | |
|---|---|---|---|---|
| **Travis Grayson** | Spartanburg, South Carolina | AT&T, DirectTV | Customer Service Representative | 23 |
| **Samone Twitty** | Spartanburg, South Carolina | USAA | Customer Service Representative | 24 |
| **Justine Luna** | Albuquerque, New Mexico | Starbucks | Customer Service Representative, Mentor, Senior Representative | 25 |

Sitel may try to distract the Court with differing job titles and slight variations in job duties to theorize that Plaintiffs and the Putative Class Members are not similarly situated. However, as discussed above, Plaintiffs need not be *identical* to the Putative Class Members, they must merely show that they are "similarly situated" to the Putative Class Members. *See Comer*, 454 F.3d at 546–47 (recognizing that a plaintiff need only show that their position is similar, not identical, to the positions held by the putative class members). Here, Plaintiffs and the Putative Class Members are similarly situated in all relevant (and necessary) respects. *See id.* Despite the various campaigns they worked on and their specific job titles, it is undisputed that all of Sitel's call-center employees are required to log-in to Sitel's computer system, open the appropriate Sitel programs, and interact with Sitel's customers on Sitel's behalf via telephone. *See generally* Exs. 3–24. A sampling of the sworn declaration testimony for various Sitel campaigns and job titles includes the following—

> During my employment with Sitel, I worked as a Customer Service Representative ("CSR") with the USAA campaign. I worked with over 200 other Sitel Call-Center Employees at the Amarillo call center. Though there are many different campaigns that Sitel employees work on, we all followed the same policies and procedures, as set by Sitel. As a CSR, it was my responsibility to receive inbound calls made by USAA customers. I would answer customer inquiries, go over billing statements with customers, and accept bill payments by customers.

*See* Ex. 3, ¶¶ 3–5 (Melissa Cannon was a Customer Service Representative on the USAA campaign at Sitel's Amarillo, Texas facility).

> During my employment with Sitel, I was an at-home Customer Service Representative ("CSR") and I worke din the Toys-R-Us campaign, the Choice Hotels Campaign, and then the DirectTV Campaign. There is no difference from workin in one campaign or another as far as general company procedures or the log in policy.

The only difference between campaigns are the people you deal with and the help you provide them.

As an at-home CSR in the Toys-R-Us Campaign, it was my responsibility to receive inbound calls from Toys-R-Us customers. I would help Toys-R-Us customers make orders, track orders, reorder lost items, and answer general questions. In the Choice Hotels Campaign, I would accept incoming calls from customers and help them book reservations. In the DirectTV campaign, it was my responsibility to receive inbound calls from DirectTV customers on upgrade[s] or other DirectTV packages.

*See* Ex. 8, ¶¶ 3, 5 (Wendy Toth was an At-Home Customer Service Representative on the Toys-R-

Us, Choice Hotels, and DirectTV campaigns out of her residence in Johnson City, Tennessee)

During my employment with Sitel, I worked as a Customer Service Representative ("CSR") with the DirectTV campaign and then the PSCU Campaign. I worked with approximately five-hundred (500) other Sitel Call-Center Employees at the Corning Call Center. I worked with approximately seven-hundred (700) to one-thousand (1000) other Sitel Call-Center Employees at the Ocala call center. Though there are many different campaigns that Sitel employees work on, we all followed the same policies and procedures, as set by Sitel. As a CSR, it was my responsibility to receive inbound calls made by DirectTV customers, I would answer customer inquiries, go over billing statements with customers, alter their subscriptions, accept bill payments, reset passwords, and upsell them on additional packages to their current subscription. As a CSR for PSCU I would receive inbound calls made by PSCU customers. I would answer customer inquiries, check a customer's loan status, reset customer passwords, and accept customer payments.

*See* Ex. 10, ¶¶ 3–5 (Kendra Sturtevant was a Customer Service Representative on the DirectTV and

PSCU campaigns at Sitel's Corning, New York facility and Sitel's Ocala, Florida facility).

During my employment with Sitel, I held several different job positions associated with the DirectTV campaign. I worked with over 500 other Sitel Call-Center Employees at the Las Cruces call center. Though there are many different campaigns that Sitel employees work on, we all followed the same policies and procedures, as set by Sitel. When I first started working for Sitel, I was employed as a Technical Support Representative ("TSR"). As a TSR, it was my responsibility to receive inbound calls made by DirectTV customers. I would help resolve any technical issue the customer was experiencing . . . . Next, I worked for Sitel as a Case Manager ("CM"). As a CM, it was my responsibilities to help customers who had more complex issues that a TSR could not resolve. I took inbound calls from specific customers who had multiple issues. I would also make outbound calls to those customers I had already helped . . . After working as a CM, I was moved and because a New Customer Queue Specialist ("NCQS"). As a NCQS, I would receive inbound calls from recent customers . . . After working as a NCQS for a while, Sitel moved me and changed my role to a Resolution Team Member ("RTM"). As an RTM, I took inbound calls from customers who had called in excess of ten (10) times in the

past thirty (30) days. . . . Next, I worked for Sitel as a Loyalty/Retention Specialist ("Retention Specialist"). As a Retention Specialist, it was my job to receive inbound calls and to make outbound calls to customers to keep them with DirectTV. . . . Finally, toward the end of my employment with Sitel, I worked as a Protection Plan Specialist ("PPS"). As a PPS, it was my responsibility to receive inbound calls from customers who had questions about or who would like to make claims through their equipment protection plans. . . . All of my jobs and my coworkers' jobs ("Call-Center Employees") were substantially similar, we all attended the same orientation together and were all taught the same policies and procedures for logging into the computer, opening the programs, and clocking in for the day.

See Ex. 12, ¶¶ 3–11 (Marquise Foster has multiple job titles while working on the DirectTV campaign at the Las Cruces, New Mexico facility).

During my employment with Sitel, I worked as a Customer Service Representative ("CSR") with the PSCU campaign and then the Best Buy Geek Squad Campaign. I worked with approximately four-hundred (400) to five-hundred (500) other Sitel Call-Center Employees at the Ocala call center. Though there are many different campaigns that Sitel employees work on, we all followed the same policies and procedures, as set by Sitel. As a CSR it was my responsibility to receive inbound calls made by SPCU customers. I would answer customer inquiries, go over billing statements with customers, check loan statuses, accept bill payments, and reset passwords. As a CSR in the Best Buy Geek Squad campaign, it was my responsibility to receive inbound calls made by Geek Squad customers. I would answer general inquiries and set up appointments.

See Ex. 13, ¶¶ 3–6 (Brittany Akers was a Customer Service Representative for the Best Buy Geek Squad and PSCU campaigns at Sitel's Ocala, Florida facility).

During my employment with Sitel, I held several different job positions associated with the Starbucks campaign. I worked with approximately four hundred (400) to six hundred (600) other Sitel Call-Center Employees at the Albuquerque call center. Though there are many different campaigns that Sitel employees work on, we all followed the same policies and procedures, as set by Sitel. When I first started working for Sitel, I was employed as a Customer Service Representative ("CSR"). As a CSR, it was my responsibility to receive inbound calls made by Starbucks customers. I would help resolve complaints made by customers, issue refunds or store credits, and take in customer experience feedback. Next, I worked for Sitel as a Mentor. As a Mentor, it was my responsibility to teach Call-Center employees. I would listen in on calls and coach Call-Center employees how to better handle calls and assist Call-Center Employees with difficult calls. After working as a Mentor, I was moved and became a Senior Representative ("SR"). As a SR, I would receive inbound calls from customers who had more serious claims or issues than the Customer Service Representatives. . . . All of my jobs and my co-workers' jobs ("Call-Center Employees") were substantially similar, we all attended the same

> orientation together and we were all taught the same policies and procedures for logging into the computer, opening our programs, and clocking in for the day.

*See* Ex. 25, ¶¶ 3–8 (Justine Luna held multiple job titles for the Starbucks campaign at Sitel's Albuquerque, New Mexico facility).

As call center employees, Plaintiffs and the Putative Class Members are (and were) scheduled to work forty (40) or more hours a week. *See* Ex. 3, ¶ 11; Ex. 4, ¶ 12; Ex. 5, ¶ 12; Ex. 6, ¶ 12; Ex. 7, ¶ 12; Ex. 8, ¶ 12; Ex. 9, ¶ 14; Ex. 10, ¶ 14; Ex. 11, ¶ 12; Ex. 12, ¶ 17; Ex. 13, ¶ 14; Ex. 14, ¶ 12; Ex. 15, ¶ 14; Ex. 16, ¶ 14; Ex. 17, ¶ 14; Ex. 18, ¶ 17; Ex. 19, ¶ 14; Ex. 20, ¶ 12; Ex. 21, ¶ 11; Ex. 22, ¶ 14; Ex. 23, ¶ 12; Ex. 24, ¶ 12; Ex. 25, ¶ 13. Though Plaintiffs' off-the-clock work was time worked in excess of forty hours a week, Plaintiffs were not paid time and a half for those hours worked on Sitel's behalf. *See id.*

All Plaintiffs followed the same general "log-in" procedure: they were required to log into their computers and begin opening all of their software applications so that they could be ready to take calls at the beginning of their shift. *See* Ex. 3, at ¶ 7; Ex. 4, at ¶ 7; Ex. 5, at ¶ 7; Ex. 6, at ¶ 7; Ex. 7, at ¶ 7; Ex. 8, at ¶ 7; Ex. 9, at ¶ 7; Ex. 10, at ¶ 7; Ex. 11, at ¶¶ 7–8; Ex. 12, at ¶¶ 12–13; Ex. 13, at ¶ 7; Ex. 14, at ¶¶ 7–8; Ex. 15, at ¶ 7; Ex. 16, at ¶ 7; Ex. 17, at ¶ 7; Ex. 18, at ¶¶ 9–10; Ex. 19, at ¶ 7; Ex. 20, at ¶ 8; Ex. 21, at ¶ 7; Ex. 22, at ¶ 7; Ex. 23, at ¶¶ 7–8; Ex. 24, at ¶¶ 7–8; Ex. 25, ¶¶ 10. After logging in to their computer, and opening the necessary applications, then Plaintiffs were ready to log-in and indicate that they were "call ready." *See id.* Sitel prohibited Plaintiffs from clocking in before being call-ready—doing so would negatively affect their variance, and could potentially lose their job. *See id.*; *see also generally* Exs. 26 and 27. Sitel's management monitored Plaintiffs and the Putative Class Members' phone systems and knew (1) when they began logging into their necessary applications, (2) when they logged on to their phones, and (3) when they were actively on the phone. *See* Exs. 26 and 27, at ¶¶ 8–9. This evidence of uniform "log-in" requirements, coupled with Sitel's ability to monitor all of Plaintiffs' activities, supports conditional certification in this case. *See Burch v.*

*Qwest Comm'n Int'l., Inc.*, 500 F. Supp. 2d 1181, 1188 (D. Minn. 2007) (finding that a centralized monitoring capability coupled with the uniform log-in requirements were evidence weighing in favor of conditional certification of a nationwide call center collective action).

In *Crosby*, the court conditionally certified a nationwide class of retail employees encompassing more than 800 retail stores in 42 states. *See* 348 F. Supp. 3d at 747–50. There, the plaintiffs alleged that the retail employees (encompassing at least 8 non-exclusive job titles) were not paid for all hours worked, were pressured to work off-the-clock, without proper overtime compensation, and were subjected to illegal time shaving. *See id.* In support of their motion for conditional certification in *Crosby*, the plaintiffs presented declarations from twelve current and former retail employees, in addition to the pleadings and briefing on file. *See id.* at 747. Here, Plaintiffs are making similar allegations. Sitel's practice of enforcing its log-in and variance requirements created an environment in which Sitel's call-center Supervisors instructed and pressured Sitel's non-exempt call-center employees to perform work off-the-clock and without pay. *See id.* at p. 2–3. Not only have twenty-five Plaintiffs provided their sworn statements to that effect, but these allegations are further supported by the corroborating declarations of former Sitel Supervisors, Rodney Jackson and Regenia Blackwell-Blackmon, who have no personal interest in the litigation. *See generally* Exs. 26 and 27. This evidence alone, especially in light of the overwhelming pre-notice opt-in rate of almost 300 current and former call center employees, is more than sufficient to support a finding that Plaintiffs and the Putative Class Members are similarly situated at this "notice" stage.

   c.  **Numerous FLSA Lawsuits Against Sitel by Call-Center Employees Shows that Plaintiffs and Putative Class Members are Similarly Situated**

Sitel is not a stranger to this type of FLSA violation. In fact, Sitel is listed as a party-defendant in at least seven other FLSA cases for their customer service representatives. *See Adams v.*

*Sitel Operating Corporation*, No. 1:16-cv-01051-LCB-JWL, ECF No. 1 (M.D.N.C. Aug. 12, 2016) (alleging identical claims on behalf of a class of at-home CSRs, currently pending settlement approval) (Ex. 28-1); *Albrets v. Sitel Corporation*, No. 2:11-cv-00869-AKK, ECF No. 1 (N.D. Ala. Mar. 3, 2011) (alleging identical claims on behalf of customer service representatives—settled April 19, 2013) (Ex. 28-2); *Cox v. Sitel Operating Corporation*, No. 3:15-cv-00037, ECF No. 1 (E.D. Tenn. Jan. 23, 2015) (alleging identical claims on behalf of the plaintiff, individually, settled August 28, 2018) (Ex. 28-3); *Garrett v. Sitel Corporation*, No. 2:10-cv-02900-STA-cgc, ECF No. 1 (W.D. Tenn. Dec. 16, 2010) (alleging identical claims on behalf of customer service representatives at Memphis, Tennessee call centere—settled November 12, 2013) (Ex-28-4); *Loding v. Sitel Operating Corporation*, No. 2:16-cv-02047-JAD-CWH, ECF No. 1 (D. Nev. Aug. 29, 2016) (alleging identical claims on behalf of a class of at-home customer service representatives—currently pending settlement approval) (Ex. 28-5); *Pinkney-Oliver v. Sitel Operating Corporation*, No. 2:18-cv-00112, ECF No. 1 (M.D. Ala. Feb. 15, 2018) (alleging identical claims on behalf of customer service representatives) (Ex. 28-6); *Wallace v. Sitel Corporation*, No. 2:08-cv-01572-AKK, ECF No. 1 (N.D. Ala. Aug. 29, 2008) (alleging identical claims on behalf of customer service representatives, settled April 6, 2010) (Ex. 28-7).

Further, in *Garrett*, the plaintiffs sought (and received) conditional certification for Sitel's Memphis, Tennessee call center. *See Garrett v. Sitel Operating Corp.,* No. 10-CV-2900-STA-CGC, 2011 WL 5827240, at *5 (W.D. Tenn. Nov. 18, 2011). The *Garrett* court recognized that

> Plaintiffs' theory as to Defendant's violation of the FLSA stems from preliminary and postliminary work performed by Plaintiffs and putative plaintiffs. That work involved booting up and shutting down computer programs and performing other tasks "essential to the performance of their jobs duties" when they were not on-the-clock. While Defendant points out that there were "at least two separate Kronos timekeeping systems used at the Memphis facility," as well as the option of entering time manually, the different methods of entering time do not alter Plaintiffs' allegations that they were required to do essential preliminary and postliminary tasks off-the-clock.

*See id.* As such, the court determined that the plaintiffs "identified an unwritten policy that Defendant required them to arrive before and stay after their shift to perform tasks that were part of the principal activities of their jobs" and that there was a sufficient basis to find that the plaintiffs and proposed class members were similarly situated. *Id.* (recognizing that the Sixth Circuit does not apply a "substantial allegations" standard in evaluating whether to grant conditional certification under the FLSA).

These other similar cases further illustrate the appropriateness of conditional certification in this matter, and other courts in the Sixth Circuit have previously certified collective actions based on the same or similar facts before this Court.

## C. DETERMINING "COMPANY-WIDE" CONDITIONAL CERTIFICATION

Finally, although Plaintiff seeks to certify a national class, the applicable standard remains the same; Plaintiffs are not subject to a higher or more burdensome standard. While it is well-settled that evidence supporting company-wide certification must be based on personal knowledge, Plaintiffs have satisfied that requirement. Here, Plaintiffs' evidence for company-wide certification is based on personal knowledge and personal experience—the twenty-five plaintiffs who have provided sworn statements through declarations are consistent in all relevant matters as they pertain to the claims and defenses at issue in this litigation. *See generally* Exs. 3–25. While Plaintiffs have not provided evidence for each facility at this early "notice" stage—they have provided consistent declarations from many of Sitel's call-center facilities throughout the United States and have satisfied their burden at this conditional certification stage. *See Crosby*, 348 F. Supp. 3d at 749–50 (certifying a class across 800 stores based on the consistent declarations from plaintiffs who had worked at eight (8) stores).

As discussed above, in *Crosby* v. *Stage Stores, Inc.*, Judge Crenshaw certified a nationwide class that encompassed retail employees at 800 stores in 42 states. 348 F. Supp. 3d at 745. The court

certified the nationwide class based on the consistent declarations of the two named plaintiffs and ten opt-in plaintiffs alleging that they were forced to work off-the-clock and were subjected to "time shaving." *See id.* at 746 (noting that the plaintiffs provided twelve declarations from eight different stores across five states); *Brodzenski v. Stonemors Partners, L.P.*, 1:14-cv-2517, 2015 WL 3442323, at *2–3 (N.D. Ohio May 28, 2015) (certifying a national class after finding that plaintiff had presented a "modicum of evidence consistent with her allegations that she and a class of individuals were denied overtime pay); *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 534 (S.D. Tex. 2008) (refusing to decertify a nationwide collective, encompassing 6,500 stores, based on defendant's "common practice of pressuring or encouraging [plaintiffs] to work off-the-clock"); *Rivenbark v. JPMorgan Chase & Co.*, 340 F. Supp. 3d 619, 624 (S.D. Tex. 2018) (certifying a nationwide class of call-center employees and finding that the declarations provided by the plaintiffs showed "[t]he consistency of this focus [of off-the-clock work] across different supervisors implies the existence of a corporate policy instead of merely miscommunication or the idiosyncratic practices of certain managers"); *see also Monroe v. FTS USA, LLC*, 815 F.3d 1000, 1010–20 (6th Cir. 2016) (addressing the purpose and process of collective actions at the decertification stage).

Even when seeking certification of a nationwide or company-wide collective, the plaintiff has the same burden to show that the same policy applies to multiple locations of the employer. *See Moreno*, 2017 WL 5904909, at *5. The broad geographic scope inherent in a nationwide class is not an impediment to conditional certification and courts do not require evidence from each complained of facility at this early notice stage. Indeed, the following is instructive:

> In cases where plaintiffs have alleged FLSA violations across a company's multiple locations, courts have held that "[i]f there is a reasonable basis to conclude that the same policy applies to multiple locations of a single company, certification is appropriate.

*Shaw v. Jaguar Hydrostatic Testing, LLC,* No. 2:15-cv-363, 2017 WL 3866424, at *5 (S.D. Tex. Sept. 5, 2017). Plaintiffs have provided substantial and credible evidence that Sitel's policies apply to multiple

locations, on a company-wide bases. *See id*; *Moreno*, 2017 WL 5904909, at *5. Accordingly, Plaintiffs'
evidence supports conditional certification of the nationwide class proposed by Plaintiffs.

**V.**
**COURT-AUTHORIZED NOTICE IS APPROPRIATE IN THIS CASE**

The Court should authorize notice to be sent to all non-exempt hourly call center employees
who worked for Sitel anywhere in the United States at any time in the last three years through the
final disposition of this matter. A collective action depends "on employees receiving accurate and
timely notice concerning the pendency of the collective action, so that they can make informed
decisions about whether to participate." *Sperling*, 493 U.S. at 170. Court-authorized notice prevents
"misleading communications" and assures the dissemination of accurate information. *Id.* at 172.

### A. PLAINTIFFS' PROPOSED NOTICE IS TIMELY, ACCURATE AND INFORMATIVE

Plaintiffs request that the Court approve the proposed Notice and Consent form attached at
Exhibit 1. Plaintiffs' proposed Court-approved notice to the Putative Class Members is "timely,
accurate, and informative," as required. *Id.* at 172. In a neutral manner, the Notice informs the
Putative Class Members of their right to opt-in to this litigation, advises that this Court has yet to
decide the merits of the dispute, and further advises that Sitel cannot retaliate against them for
asserting their rights under the FLSA.

### B. PLAINTIFFS' PROPOSED NOTICE AND CONSENT FORMS SHOULD BE SENT VIA FIRST CLASS MAIL AND E-MAIL

Plaintiffs propose distributing the Notice and Consent forms via First Class Mail and e-mail
to all current and former call center employees who worked for Sitel at any time during the past
three years through the present. E-mail notice is a common form of notification in FLSA cases and
is routinely granted by courts in the Sixth Circuit and across the United States. *Crosby*, 348 F. Supp.
3d at 751–52 (recognizing that "courts within the Sixth Circuit have routinely approved dual

notification through regular mail and email") (citing *Evans v. Caregivers, Inc., No.* 3:17-cv-0402, 2017 WL 2212977, at *7 (M.D. Tenn. May 19, 2017) *Williams v. King Bee Delivery, LLC,* No. 5:15-cv-306, 2017 WL 987452, at *7 (E.D. Ky. Mar. 14, 2017); *Fenley v. Wood Grp. Mustang, Inc.*, 170 F. Supp. 3d 1063, 1074 (S.D. Ohio 2016)). Further, as the Honorable Judge Robert Pitman recognized in *Page v. Crescent Directional Drilling, L.P.*, "[e]mail is not the wave of the future; [it] is the wave of the last decade and a half[.]" No. 5:15-cv-193-RP, 2015 WL 12660425, at *3 (W.D. Tex. Dec. 10, 2015) (citing *Rodriguez v. Stage 3 Separation, LLC*, 5:17-cv-603-RP, at 2 n.1 (W.D. Tex. Mar. 16, 2015)). Notice by e-mail effectuates the broad remedial purpose of the FLSA to facilitate notice to members of the putative class. *Brittmon v. Upreach, LLC*, 285 F. Supp. 3d 1033, 1044 (S.D. Ohio 2018) ("Allowing dual notice [by mail and email] 'advances the remedial purpose of the FLSA, because service of the notice by two separate methods increases the likelihood that all potential opt-in plaintiffs will receive notice of the lawsuit, and of their opportunity to participate.'") (citing *Williams v. King Bee Delivery, LLC*, No. 5:15–cv–306–JMH, 2017 WL 987452, at *7 (E.D. Ky. Mar. 14, 2017)).

Plaintiffs' counsel will oversee the dissemination of such Court-approved notice and pay the up-front charges. Plaintiffs' counsel also requests that it be permitted to employ a third-party administration company to assist in the notice process if Plaintiffs' counsel deems it necessary and appropriate. All Putative Class Members interested in joining this lawsuit would be required to return their respective consent form to Plaintiffs' counsel for filing with this Court within sixty (60) days of the initial mailing of the Notice and Consent forms.

Plaintiffs further request that Putative Class Members have the option to execute their consent forms online through an electronic signature service. This service allows Putative Class Members to sign their consent forms electronically by clicking on a link in an encrypted e-mail designated only for that user, which in turn allows the user to review the document, indicate the user read and understood the consent form, and type additional information. Users are instantaneously

provided with a PDF copy of the form, and a copy is accessible to Plaintiffs' counsel who will, in turn, file the same with the Court. Importantly, this would merely be an additional option for signing the consent form.

**C.     THE NOTICE AND CONSENT FORMS SHOULD BE POSTED AT SITEL'S CALL CENTER FACILITIES NATIONWIDE**

Plaintiffs also propose that the Notice and Consent forms be posted in plain view at each of Sitel's call centers, nationwide. Courts in the Sixth Circuit, and in this District, have required that employers post the notice at a conspicuous location in their facilities. *See Crosby*, 348 F. Supp. 3d at 752 (citing *Evans v. Caregivers, Inc.*, No. 3:17-cv-0402, 2017 WL 2212977, at *7 (M.D. Tenn. May 19, 2017); *Jowers v. NPC Int'l, Inc.*, No. 13-1036, 2016 WL 7238963, at *8 (W.D. Tenn. Dec. 13, 2016); *Brown v. Consol. Rest. Operations, Inc.*, No. 3:12-00788, 2013 WL 4804780, at *7 (M.D. Tenn. Sept. 6, 2013)).

**D.     PRODUCTION OF THE LAST FOUR DIGITS OF SOCIAL SECURITY NUMBERS**

Plaintiffs also propose that Sitel provide Plaintiffs' counsel the last four digits of the social security number of any Putative Class Member for whom the mailed notice is returned as undeliverable by the United States Postal Service. The last four digits are needed to obtain current contact information for the Putative Class Members and are routinely produced by an employer for purposes of the notice process. *See Lindberg v. UHS of Lakeside, LLC*, 761 F. Supp. 2d 752, 765 (W.D. Tenn. 2011) (ordering production of the name, last known address, last known telephone number, employee number, last four digits of the Social Security number, work location(s), and dates of employment for each individual who was or is employed by the defendant). In this case, having the last four digits of the putative class members' social security numbers will help identify and distinguish those individuals with the same or similar names.

## E. REMINDER NOTICES SHOULD BE SENT TO PUTATIVE CLASS MEMBERS

In addition to the initial notice by regular mail and e-mail, Plaintiffs request permission to send a follow-up reminder notice via regular mail and e-mail thirty (30) days after the initial notice is sent to those who have not opted into the case. Sending a reminder notice with a consent form helps to further the FLSA's broad remedial purposes by ensuring that all persons who are interested in joining the collective action do so within the prescribed time-period. *See Kidd v. Mathis Tire & Auto Serv., Inc.*, No. 2:14-CV-02298-JPM, 2014 WL 4923004, at *3 (W.D. Tenn. Sept. 18, 2014)

> In order for the FLSA to serve its remedial function, putative class members must actually become aware of their right to opt in. Although it may be inappropriate for the Court to sanction notice that actually functions to encourage recipients to join a law suit, that is not the apparent function of the Reminder Notice. As such, the Court finds that the Reminder Notice functions primarily to inform putative class members of their rights.

*See id.* Here, as in *Kidd*, the reminder notice further works to notify the Putative Class Members about their right to opt-in to the lawsuit, and is well within this Court's discretionary authority. *See id.*

## F. COURTS ROUTINELY REQUIRE THE PRODUCTION OF PERSONAL CONTACT INFORMATION FOR THE NOTICE PROCESS

Plaintiffs request that the Court order Sitel to provide the names, last known mailing addresses, all known e-mail addresses, phone numbers, dates of birth, driver's license numbers, and dates of employment for all Putative Class Members. Production of a mailing list and contact information for the Putative Class Members is a necessary (and routine) component of the notice process in collective actions. *See Lindberg*, 761 F. Supp. 2d at 765. All of the requested information is necessary to allow Plaintiffs sufficient information to confirm current addresses and/or locate those Putative Class Members who may have moved. Moreover, the production of all known e-mail addresses is particularly important because (as noted above) such contact information typically does not change when a person moves, and e-mail notice is an efficient and convenient form of communication.

# VI.
# CONCLUSION

Based on the pleadings, briefing, depositions, declarations, and job postings, Plaintiffs have affirmatively demonstrated that they and the Putative Class Members are similarly situated and Court-approved notice should be sent to all current and former non-exempt call center employees who worked for Sitel Operating Corporation anywhere in the United States at any time in the last three years through the present. To facilitate the purpose of the collective action provisions, Plaintiffs respectfully request that the Court grant this Motion and grant the following relief to Plaintiffs:

(1)    Conditionally certify this case as a collective action for purposes of notice and discovery;

(2)    Order Sitel to produce to Plaintiffs' counsel within fourteen (14) days of the granting of this Motion, in a computer-readable format, the contact information (including the names, addresses, telephone numbers, e-mail addresses, employee identification numbers, dates of birth, dates of employment with corresponding locations of employment, and last four digits of social security numbers) for each Putative Class Member;

(3)    Approve the form and content of Plaintiffs' proposed judicial notice and reminder notice;

(4)    Order that judicially-approved notice be sent to all Putative Class Members via First Class Mail and e-mail, and allow the hiring of a third-party administration company, for use at Plaintiffs' discretion;

(5)    Authorize the Putative Class Members to execute their consent forms electronically;

(6)    Authorize a 60-day notice period for the Putative Class Members to join the case;

(7)    For any such other relief as this Court deems just and proper.

Date: March 1, 2019                    Respectfully submitted,

**ANDERSON ALEXANDER, PLLC**

By:    /s/ *Austin W. Anderson*
       **Austin W. Anderson** (*admitted pro hac vice*)
       Texas Bar No. 24045189
       austin@a2xlaw.com
       **Clif Alexander** (*admitted pro hac vice*)
       Texas Bar No. 24064805
       clif@a2xlaw.com
       819 N. Upper Broadway
       Corpus Christi, Texas 78401
       Telephone: (361) 452-1279
       Facsimile: (361) 452-1284

**MORGAN & MORGAN, P.A.**

By:    /s/ *Brian C. Winfrey*
       **Brian C. Winfrey, Esq.**
       TBN 025766
       810 Broadway, Suite 105
       Nashville, TN 37203
       Telephone:     (615) 928-9890
       Facsimile:     (615) 928-9917
       Email:  bwinfrey@forthepeople.com

By:    /s/ *C. Ryan Morgan*
       **C. Ryan Morgan, Esq.** *(Pro Hac Vice Anticipated)*
       FBN 0015527
       20 N. Orange Ave., Suite 1600
       Orlando, FL 32802-4979
       Telephone:     (407) (407) 418-2069
       Facsimile:     (407) 245-3401
       Email:  rmorgan@forthepeople.com

By:    /s/ *Paul M. Botros*
       **Paul M. Botros, Esq**. *(Pro Hac Vice Anticipated)*
       FBN 0063365
       600 N. Pine Island Road, Suite 400
       Plantation, FL 33324
       Telephone:     (954) 327-5352
       Facsimile:     (954) 327-3017
       Email:  pbotros@forthepeople.com

       ***Attorneys for Plaintiff and the Putative***
       ***Class Members***

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Middle District of Tennessee using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

/s/ *Austin W. Anderson*
Austin W. Anderson